IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

                                                                     No.  CR 21-1510 KWR

**Plaintiff,**

vs.

**CHRISTOPHER MARQUEZ,**

      **Defendant.**

### DEFENDANT'S SEN TENCING MEMORANDUM

      Defendant Christopher Marquez comes before this Honorable Court pursuant to the Fifth Amendment of the United States Constitution and 18 U.S.C. § 3661 to respectfully request that this Honorable Court accept his plea to the assimilative crime of child abuse.  The plea was entered under Rule 11(c)(1)[C] of the Federal Rules of Criminal Procedure and the parties have agreed that a sentence of eighteen years in the Custody of the United States Bureau of Prisons is sufficient, without being greater than necessary, to reflect the seriousness of the offense, promote respect for the law and provide a just punishment.  18 U.S.C. § 3553, subd. (a)(2)(A).  Mr. Marquez respectfully submits that a prison sentence of 216 months is appropriate in this case because it will afford adequate deterrence, provide him with needed medical care for his traumatic brain injury and provide an appropriate sentence for the admitted offense.

## OBJECTIONS TO THE PRE-SENTENCE REPORT

Mr. Marquez has no objection to the Pre-Sentence Report which would require this Honorable Court to convene an evidentiary hearing to resolve any disputed facts. Fed. R. Crim. P., Rule 32 (f)(1) and (i)(2).  Although the Pre-Sentence Report correctly recounts the salient portions of the investigative reports from the Bureau of Indian Affairs and the Ohkay Owingeh Tribal Police and details allegations made by Jane Doe 1 (the child) and Jane Doe 2 (the child's mother) (PSR ¶¶ 11-18), Mr. Marques continues to question the reliability of some of these claims because the forensic interview of Jane Doe 1 was not conducted in conformity with prevailing professional norms which are designed to be neutral, not leading and not offender focused.  Nevertheless, Mr. Marquez does not dispute or disavow his admission of facts in the Plea Agreement and he accepts responsibility for intentionally, knowingly, negligently and without justifiable cause placing Jane Doe 1 in a situation which endangered her life and health by assaulting her, shaking her and twisting her arm. (Dox. 169. ¶¶ 9-10.)

## STATEMENT OF FACTs

Christopher Marquez was born on February 6, 1990 and became the third child of Charles Yates and Rose Marquez.  Sadly, Mr. Marquez's father abandoned his family shortly after Mr. Marquez was born and, as a result, Mr. Marquez's father never played any part in Mr. Marquez's life.

Mr. Marquez was raised by his single mother, Rose Marquez. Although his mother struggled to provide for the family financially, Mr. Marquez had a great relationship with his mother and his siblings. Mr. Marquez recalls that he experienced a happy childhood growing up in the Ohkay Owingeh Pueblo where he felt loved and supported and al of his basic needs were met.

When he was fourteen years old, Mr. Marquez enrolled in a summer, tribal reforestation program. Tragically, one day when he was working in the program he was returning to the tribal offices and riding on the edge of the bed of pick-up truck, when he fell out of the truck and seriously injured his head. Mr. Marquez was unconscious for a prolonged period time and he was rushed to St. Vincent's Medical Center in Santa Fe and then he was transported to the University of New Mexico Carrie Tingley Children's Hospital where he underwent emergency brain surgery. Mr. Marquez then spent months in the hospital receiving treatment for his head injury, followed by additional time at a residential rehabilitation center which specialized in recovery from closed head injuries. When he was in the rehabilitation center Mr. Marquez had to re-learn how to walk and needed speech threapy in order to talk. Ultimately Mr. Marquez was diagnosed with a traumatic brain injury because of the severe damage to the frontal lobe of his brain which he sustained in the accident. (See Doc. 48, p. 5.)

Injuries to the frontal lobe of the brain can result in profound, long-term negative consequences. A person with a traumatic brain injury characterized by

damage to the frontal lobe will often experience cognitive, emotional and behavioral dysfunction characterized by memory loss, impulsivity, anger issues and poor judgment. (See Doc. 48, p. 5.) Sadly, Mr. Marquez has experienced each of these negative aspects of his traumatic brain injury throughout his young life.

Although Mr. Marquez has worked hard in the years following his accident in an effort to return to something approaching a "normal" life, he has nonetheless been consistently plagued by the recurring symptoms of his traumatic brain injury. According to his mother, Mr. Marquez's brain injury has affected his judgment and decision making throughout his adult life and has often led to him to act impulsively without adequate forethought. Mr. Marquez also reports that his traumatic brain injury has led to memory problems and frequent (sometimes constant) migraine (or "cluster") headaches which can cause vomiting, dizziness. a tight feeling in the chest and shortness of breath. At times these maladies have so seriously impaired Mr. Marquez's daily functioning that they have impeded his ability to attend school or made it impossible for him to maintain a job.[1]

Mr.Marquez was previously married to Kaylina Marquez and together the couple have two children, Larik and Elanese. Kaylina reports that Mr. Marquez has been an excellent father to his children and he has played an active part in their lives. After the couple divorced, they shared joint custody of their children and split their

---

[1] According to Mr. Marquez, these painful headaches and the accompanying symptoms are often brought on my stress and have been particularly acute in the months since the entry of his plea of guilty.

custodial time. Both Mr. Marquez's mother and Kalina report that Mr. Marquez has been a loving, caring and attentive father in the three years since he became a single parent and that he has <u>never</u> used any excessive discipline or unreasonable physical force or otherwise harmed his children <u>at</u> <u>any</u> <u>time</u> <u>or</u> <u>in</u> <u>any</u> <u>way</u>.

In the spring of 2021 Mr. Marquez met Jane Doe 2 (an enrolled member of the Zuni Pueblo).  The two met on Facebook and quickly developed an online friendship based on their interest in a fetish lifestyle characterized by dominant and submissive roles in a relationship.  After chatting online for some time, the two then decided to meet in person.  In early May 2021 Mr. Marquez drove to the Zuni Pueblo to pick up Jane Doe 2 so that she could spend the weekend withhim.  When he arrived in the Zuni Pueblo and met Jane Doe 2 in person he learned that Jane Doe 2 intended to bring her daughter, Jane Doe 1, to their "get acquainted" weekend.  Mr. Marquez did not object to Jane Doe 1 joining them, so he brought both of them back to his home in the Ohkay Owingeh Pueblo

At the time she went to visit Mr. Marquez Jane Doe 2 was unemployed and traveling between friends' homes.  Before heading to the Ohkay Owingeh Pueblo for the weekend visit, Jane Doe 2 was not responsible for the custody of her daughter and she had not spent much time with her daughter in 2021, Jane Doe 1.  Instead, beginning in the winter of 2020, Jane Doe 1was left in the custody of Jane Doe 2's mother (Jane Doe 1's grandmother) in the Zuni Pueblo because Jane Doe 2 was traveling extensively and Jane Doe 1 was enrolled in the Zuni Pueblo Head Start .

Although Jane Doe 2 and her child intended to visit the Ohkay Owingeh Pueblo for only a weekend, within two days Mr. Marquez and Jane Doe 2 abruptly decided to live together in Mr. Marquez's home. At that time both Jane Doe 1 and Jane Doe 2 had only enough clothing for a weekend visit,. Consequently. within days of arriving in the Pueblo, Mr. Marquez and his mother were compelled to assist Jane Doe 1 and 2 by buying them clothes.

Mr. Marquez nd Jane Doe 2 lived together in the Ohkay Owingeh Pueblo for about 3 months.  During that time, the couple returned to the Zuni Pueblo on at least two occasions, once to visit with Jane Doe 2's family and once to attend Jane Doe 1's graduation from Head Start.  During these trips to her native Pueblo, Jane Doe 2 never reported any physical or emotional abuse to her family.

While living in Ohkay Owingeh, Jane Doe 1 and Jane Doe 2 were fully integrated into Mr. Marquez's life.  They lived with him and his children in Mr. Marquez's home and his children quickly developed a familial relationship with Jane Doe 1.  Mr. Marquez's family members recall that, during the summer of 2021 they often saw Jane Doe 1 and 2 at T-Ball games, movie nights, birthday parties and bar-b-ques.  These family members report that, during that time, Jane Doe 2 never complained of any physical or emotional abuse and that they never observed Jane Doe 1 with any physical injuries.  Finally, when Jane Doe 1 and 2 were living in his home, Mr. Marquez and his mother helped Jane Doe 2 obtain a New Mexico driver's license

so that she could apply for public assistance because she relied exclusively on Mr. Marquez and his family to provide for her and her daughter's basic needs.

Ultimately Mr. Marquez separated from Jane Doe 2. Although Jane Doe 2 claims that she fled Mr. Marquez's home by escaping one night while he slept, Mr. Marquez recalls that, on July 9, 2021, he asked Jane Doe 2 to leave his home because of her chronic use of methamphetamine.

The investigation in this case established that, when she left Mr. Marquez's home, Jane Doe 2 did not immediately go to the hospital or to the police. Instead, when she separated from Mr. Marquez, Jane Doe 2 called the only other person she knew in the Ohkay Owingeh Pueblo outside of Mr. Marquez and his family, her drug dealer. This individual, who has been identified by neighbors as a methamphetamine supplier, picked up Jane Doe 2 and took her to her house, a manufactured home in the Pueblo with a reputation as a "drug" house. Jane Doe 2 and her daughter spent at least one night in this "trap" house and, on the night before she went to the police, witnesses report that there was a huge fight at the home which involved a fracas over a child and which led to the collapse of the porch of the home during a gang fight.

Mr. Marquez was arrested at the end of the sumer of 2021 and charged with inflicting all of the injuries which were discovered when Jane Doe 1 went to the hospital on July10, 2021. In order to spare Jane Doe 1 the ordeal of a trial, Mr. Marquez agreed to enter a plea of guilty the day before jury selection in this matter was set to begin. When he learned that he could be convicted of child abuse even if

he never laid a hand on Jane Doe 1 on a theory that he negligently permitted Jane Doe 1 to be abused while she was in his home (Cf. *State v. Chavez,* 2009-NMSC-035, ¶¶ 17-21), Mr. Marquez pled guilty to the assimilative crime of aggravated child abuse resulting in great bodily injury in violation of NMSA 30-6-1(D) based on acts of abuse which included multiple physical assaults resulting in numerous broken bones in various stages of healing.

## LEGAL AUTHORITIES

The Assimilated Crimes Act, 18 U.S.C. § 13, provides federal jurisdiction for certain state crimes which are committed in a Native American enclave. When no specific federal statute applies to the defendant's alleged criminal conduct, the ACA generates a federal offense for this "gap" by using the law of the state where the native nation is located. *United States v. Polk,* 61 F.4th 1277, 1279 (10th Cir. 2023). The Act allows federal courts "to borrow the relevant crime from pre-existing state law." *Ibid.* While the ACA does not require federal courts to incorporate every aspect of the state law to the assimilative offense during sentencingt, it does require that the Defendant receive "a like punishment," namely a sentence within any minimum and maximum sentencing range the Defendant would receive if they were convicted and sentenced of the assimilative crime in state court. *Id.* at 1280, citing 18 U.S.C. § 13 (a).[2]

---

[2] After Mr. Marquez entered his plea of guilty, the United States Court of Appeal for the Tenth Circuit returned a decision in *United States v. Shell,* 2024 WL 3455033 (10th Cir. 2024) holding that the District Court erred in allowing the defendant to be prosecuted under an Oklahoma child abuse statute because there was no "gap" in federal law which needed to be filled by the ACA. Applying the two-part test set out by the United States

If this matter proceeds to sentencing, Mr. Marquez contends, consistent with the promises he made in accepting a Rule 11(c)(1)[C] Plea Agreement, that a sentence of eighteen years is sufficient, without being greater than necessary, to promote respect for the law and provide a just punishment in light of the category of this offense and the history and characteristics of this offender.  An eighteen-year sentence in prison is the presumptive sentence provided by the laws of the State of New Mexico for aggravated child abuse.  This long sentence will specifically deter future crimes by incapacitating Mr. Marquez until he is almost fifty years old and provides general deterrence by showing the community atMoreover an eighteen year sentence would recognize Mr. Marquez's unique history and characteristics which include the adverse effects of his traumatic brain injury (which may have contributed to some of the wrongful conduct in thihs case) and the fact Mr. Marquez is in Criminal History Category I and has no useable criminal convictions which would enhance his sentence.³  An eighteen year sentence would also appropriately recognize that Mr.

---

Supreme Court in *Lewis v. United States,* 118 S.Ct. 1135 (1998), the *Shell* Court concluded that because federal assault statutes could be applied in Mr. Shell's case, any effort to assimilate a state child abuse statute where the federal assault statute applies "would efectively rewrite an offense definition that Congress carefully considered." *Id.* at * 4.  In light of the gross disparity between the 51 to 63 month sentence recommended by the United States Sentencing Guidelines as compared to the 18 year sentence provided by the New Mexico statute (a sentence more than three times as long), Mr. Marquez submits that, without trying to violate the extant plea agreement, this Honorable Court may want to reconsider, *sua sponte*, Mr. Marquez's Motion to Dismiss, even though this particular argument was not raised in the Motion.

³ Mr. Harris does have tribal court convictions for various misdemeanor offenses but the attorney representation in the cases are mostly unknown.

Marquez ultimately, if belatedly, accepted responsibility for his criminal conduct and spared the Court, the jury and counsel for the parties the painful prospect of subjecting a seven year-old witness to cross examination by a 63 year-old man.  Finally, an eighteen-year sentence would be especially appropriate in this case in light of the fact that a co-participant in the criminal activity, Jane Doe 2, was not subjected to any criminal prosecution and faces no criminal sanction of any kind.

      WHEREFORE, in the absence of any consideration of the effect of *Shell* on these proceedings, Defendant Christopher Marquez respectfully requests that this Honorable Court accept the Rule 11(c)(1)[C] Plea Agreement and impose the agreed upon sentence of eighteen years in the custody of the United States Bureau of Prisons.

      Respectfully submitted,

*/s Brian A. Pori 10/11/24*
Brian A. Pori
Attorney at Law
204 Bryn Mawr NE
Albuquerque, NM 87106

Counsel for Christopher Marquez

## CERTIFICATE OF SERVICE

  I hereby certify that on this 11th day of October, 2024 I filed the foregoing Sentencing Memorandum through the District Court CM/ECF electronic filing program which caused a copy of the pleading to be electronically delivered to counsel for the United States addressed as follows:

Mark Probasco Esq.
Matt cKinley, Esq.
United States Attorney's Office
P.O. Box 607
Albuquerque, NM 87103

                */s Brian A. Pori 10/11/24*
                Brian A. Pori